BY THE COURT:
 

 As the original decree has not been carried into execution, we think it proper, under the peculiar circumstances of the present cafe, to allow a re-hearing. But this is not to be drawn into precedent; nor is any point previously determined, to be brought again into litigation, unless the state of the facts respecting it shall be altered by the new evidence.
 

 The causes were, accordingly, argued for several successive days; and on the 24th
 
 of January
 
 1782, the following revisionary decree (altering the suspended decree only as to a part of the cargo) was delivered by WILLIAM PACA, and CYRUS GRIFFIN, the presiding Commissioners.
 

 By the Court. We have considered the new evidence
 
 *21
 
 which has been laid before us, and we have also considered the observations and arguments, which the Counsel upon both sides have made upon it.
 

 On the first argument we were of opinion, that the ship ought to be considered in the predicament of neutral property, and entitled to all the rights and privileges of neutrality, which the Ordinance of Congress ascertained and conferred; we took up this idea from a construction of the articles of capitulation and the
 
 British
 
 proclamation, which issued immediately on the rupture between
 
 Great Britain
 
 and the
 
 States General,
 
 and which protected the ship Res
 
 olution
 
 for a limited time from
 
 British
 
 Capture on her passage from
 
 Dominica to Amsterdam
 
 : We conceived, that the neutrality of the
 
 States General,
 
 with regard to the ship, abstractedly considered, was not broken by the rupture; the proclamation having controuled the extent of the war, by its exemption of the ship from being a subject of hostility and capture.
 

 Such was our opinion on the first argument: But on consideration of the last argument, we are of a different opinion.
 

 The writers upon the law of nations, speaking of the different kinds of war, distinguish them into perfect and imperfect: A perfect war is that which destroys the national peace and tranquility, and lays the foundation of every possible act of hostility: The imperfect war is that which does not entirely destroy the public tranquility, but interrupts it only in some particulars, as in the case of reprisals.
 

 Before
 
 Great Britain
 
 commenced war with the
 
 States General,
 
 the
 
 States
 
 were a neutral nation with regard to the war between
 
 Great Britain, France, Spain,
 
 and
 
 America:
 
 They had taken no part in the war, and were a common friend to all. This is precisely the legal dea-of a neutral nation: It implies two nations at war, and a third in friendship with both. The war which
 
 Great Britain
 
 commenced with the
 
 States General
 
 was a perfect war. It destroyed the national peace of the
 
 States General,
 
 and with it the neutrality of the nation. The
 
 States
 
 became a party in the general war against Britain: They were no longer a common friend to the belligerent powers; and therefore they ceased to be a neutral nation.
 

 War having thus destroyed the neutrality of the
 
 States General,
 
 they can never resume the character of a neutral until they are in circumstances to resume the character of a common friend
 
 to Great Britain, France, Spain
 
 and America: But this character is not to be acquired, while war subsists between them and
 
 Great Britain.
 
 Only a peace, therefore,
 
 between Britain
 
 and the States, can put the
 
 States
 
 in a capacity to resume their original character of neutrality. But there can be no peace without the concurrence of both nations: The
 
 British
 
 could not therefore, by
 
 *22
 
 the mere authority of their proclamation, restore back to the
 
 Ship Resolution
 
 her original neutrality. The Proclamation could only operate as a protection of the Ship from
 
 British
 
 capture.
 

 We, therefore, layout of question the ordinance
 
 of Congress
 
 with regard to the rights of neutrality; this case is not within it. But the Ship
 
 Resolution
 
 is captured and both Ship and Cargo are libelled as prize. A question is made; on whom lies
 
 the onus probandi?
 
 We think on tire captors. There can be no condemnation without proof that the Ship or Cargo is prize; and it cannot be expected, that the persons who contest the capture will produce that proof.
 

 Every capture is at the peril of the party. A privateer is not authorized to capture every vessel found on the high sea: She is commissioned to capture only such ships as are the property of the enemy. Every ship indeed may, in time of war, be brought to and examined; but the is not to be seized and captured, without the captors have just grounds to think the is the property of an enemy, and not the property of subjects of a nation in peace and friendship, or neutrality. If such seizure and capture are made without just grounds, the party injured is entitled to have an action for damages: And it is the policy of all nations at war to oblige the captains of privateers to give bond and security, to enforce a proper conduct while at sea, and to prevent seizures and captures from being wantonly made.
 

 The sea is open to all nations: No nation has an exclusive property in the sea. Put the case then, that a privateer meets a ship at sea; is it to be inferred, from the mere circumstance of the ship’s being found on the high seas, that she is the property of an enemy? Surely there is no ground for such an inference: On this ground a privateer might seize and capture the ships of its own nation. But the privateer attacks, seizes, captures and brings the ship into port: It is plain here is an act of violence; a seizure and capture. The captain therefore must do two things: At all events he must shew just grounds for the violence or he will be punishable at law by an action of damages: and in the next place, before he can obtain condemnation, he must prove the ship to be the property of an enemy; for, it can never be enough for condemnation, that he found the ship at sea.
 

 The captors say: “That in the present case, they had not only "just grounds for seizure; but they have also just grounds for “condemnation: For both the ship and cargo were found i“ the possession of
 
 British
 
 subjects, and therefore
 
 British
 
 pro-“perty.”
 

 It must be admitted that possession is a presumptive evidencof property because possession is a circumstance which generally accompanies property, and, therefore, the seizure and capture, in the present case, was a violence at all events justified
 
 *23
 
 the law of nations, and for which no action would lie, even on acquittal of the Ship and Cargo. But the possession in this case is no ground for condemnation: For what is the nature of presumptive evidence? It only has the force of evidence which it remains uncontested. The possession is clearly accounted for: The ship came into the hands of the enemy by capture; and the prior possession was in the hands of
 
 Dutch
 
 subjects, and not
 
 British su
 
 bjects. The presumption therefore relied on by the captors is defeated, and the argument founded on the possession is in favor of the claimants.
 

 On the question of Prize or no Prize, what evidence does the law of nations admit for the determination of it?
 

 The national interest of every commercial country requires, that some mode or criterion be adopted to ascertain the ship, cargo, destination, property and nation to which such ship belongs; not only as a security for a fair commerce according to law; but as a guard against fraud and imposition in the payment and collection of duties, imposts and commercial revenues. The peace also and tranquility of nations equally require, that the like criterion should be adopted, to distinguish the ships of different countries found be the high seas in time of war; to prevent an indiscriminate exercise of acts of hostility, which may lay the foundation of general and universal war. Hence it is, that every commercial country has directed, by its laws, that its ships shall be furnished with a set of papers called Ship Papers: And this criterion the law of nations adopts, in time of war, to distinguish the property of different powers, when found at sea; not indeed as conclusive, but presumptive evidence only. Bills of lading, letters of correspondence, and all other papers on board, which relate to the ship or cargo, are also considered as
 
 prima facie
 
 evidence of the facts they speak; because such papers naturally accompany such a mercantile transaction.
 

 Such then is the evidence which the law of nations admits on a question of prize or no prize; and it is on this evidence that vessels with their cargoes are generally acquitted or condemned: And therefore, if in this case the papers on board affirm the ship and cargo to be such property as is not prize, there must be an acquittal, unless the captors are able, by a contrariety of evidence, to defeat the presumption which arises from the papers, and can shew just grounds for condemnation. On the other hand, if the papers affirm the ship and cargo to be the property of an enemy, there must be a condemnation, unless they who contest the capture can produce clear and unquestionable evidence to prove the contrary.
 

 The papers on board, the manifest, clearance, bills of lading, the depositions annexed, the certificates of the Chief Justice of
 
 Dominica,
 
 the
 
 French
 
 Governor's passport, and the letters of cor
 
 *24
 
 respondence from the shippers, collectively taken, prove the Ship to be the property of
 
 Brantlight
 
 &
 
 Son,
 
 subjects of the
 
 States General,
 
 at the port of
 
 Amsterdam,
 
 and the cargo to be the property of
 
 British
 
 capitulants, residing or owning estates in the Island of
 
 Dominica,
 
 and entitled to the rights of commerce according to the capitulation on the conquest of that Island; except with regard to such parts of the cargo as were shipt by Morson,
 
 & Co. Morson, Vance, & Co.
 
 and
 
 Lovel,
 
 Morson,
 
 & Co.
 

 It lies then on the captors to obviate the force of this evidence: It must be obviated, or an acquittal must be decreed, to the full extent of the evidence.
 

 The paper's have been taken up by the Counsel for the captors and separately and distinctly considered, and it is said they do not prove the facts to which they are adduced. It is true, separately considered, they do not; but collectively taken, we think they do, except in the instances we have mentioned.
 

 Many objections have been made to obviate the force of this presumptive evidence: The objections go to the competency of many of the papers, and to the credibility of all. “The certi-“ficates of the Chief Justice, it is said, ought not to be admit-“ted as legal and competent evidence; for the Chief Justice is “ a
 
 British
 
 Judge of the Island of Dominica, and an enemy.”
 

 We do not think the Chief Justice of that Island, reduced as it is by conquest, can with propriety be called a
 
 British
 
 Judge and an enemy. But whether he derives his commission originally from the Crown, and still holds it under the articles of capitulation, and so far is a
 
 British
 
 Judge, or not, he must certainly be subject to removal by the
 
 French
 
 government; and it highly derogates from the honor and dignity of the
 
 French
 
 Crown, and too deeply affects the zeal and loyalty of Governor Duchilot, to admit the supposition, that a man is suffered to fill so important an office, who publicly prostitutes his official character from a partiality to the
 
 British
 
 nation.
 

 The Chief Justice gave his certificates officially and under the obligation of an oath: We must want charity indeed, if, under these circumstances, we were to say, that they have not even thforce of presumptive evidence.
 

 But the competency of this evidence, so far as it is adduced to prove the owners or shippers of the cargo
 
 British
 
 capitulants, is objected to, on another ground. It is said; “These certificates “are not the best evidence the nature of the case will admit, “and which the party has in his power to produce: An attest
 
 -“
 
 ed copy of the articles of capitulation, and the names subscri-“bed, ought to have been produced.”
 

 This principle of evidence applies forcibly against the captors, but does not affect the claimants. The articles of capitulation bind
 
 Great Britain, France
 
 and
 
 America.
 
 It is a solemn compact
 
 *25
 
 or treaty. All the parties to it, the citizens of each nation, are morally bound by it: And it is not only admitted, but contended for, by the counsel for the captors, that even neutral nations are under a moral obligation to regard it; and that it is upon this principle the law of nations takes cognizance of and determines upon it.
 

 The papers on board shew a fair commerce, and affirm the cargo to be the property of capitulants, except in the instances mentioned. If they are not capitulants, and yet
 
 British
 
 subjects, they have violated the capitulation, engaged in a fraudulent and illicit commerce, and are chargeable with a breach of moral obligation. The claimants stand upon two grounds of presumption: first, the presumption which arises from the papers; and then the presumption that no man would do that which he is morally bound not to do. The claimants cannot be affected while these presumptions remain uncontested. How are they to be contested? By what evidence? Certainly the best evidence that the nature of the case will admit, and which the captors have in their power to produce. And if an attested copy of the articles, and of the names subscribed is the best evidence to prove who are capitulants, it is the best to prove who are not capitulants; and, therefore, the captors ought, on their own principles, to produce it; they having it as much in their power to produce such copy as the claimants.
 

 But it is said, “the ship’s papers are defective; the register “is not produced; it is withheld, and gives a ground of sus-“picion.”
 

 We hare no doubt, a register was on board at the time of the capture: But we do not think there is any ground for suspicion under the circumstances of the case.
 

 The
 
 Resolution
 
 was captured by a
 
 British
 
 privateer. The
 
 British
 
 captain took possession pf the ship’s papers, and captain
 
 Waterburgh,
 
 the captain of the
 
 Resolution,
 
 was made prisoner. Afterwards the
 
 Resolution
 
 was captured by the
 
 American
 
 privateer, and the
 
 American
 
 captain took possession of such papers, as
 
 the British
 
 captain had suffered to remain on board the
 
 Resolution.
 
 Captain
 
 Waterburgh
 
 was not brought into port with his ship.
 

 It was the interest of both
 
 the British
 
 and
 
 American
 
 captains to withhold the register, if it proved the ship to be the property of subjects of
 
 the States
 
 General; and neither the
 
 British
 
 captain nor
 
 the American
 
 captain have made oath, that the papers produced to the Court are all the papers, which were found on board, and came respectively to their hands and possession.
 

 But it is said, "no credit or faith is to be given to those pa-“pers, because replete, with contradiction and absurdity. The
 
 *26
 
 “ Manifest, it is said, contradicts the Bills of Lading & “The Manifest purports the property of the cargo to be in the
 
 “
 
 persons named therein as the shippers, and the Bills of La-“ding shew, in many instances, that the property is in others.”
 

 The Manifest exhibits a column under the description of shippers; and it also exhibits a column under the description of marks, and other columns for the cargo.
 

 The Bills of Lading correspond with the column of marks; and the persons described as shippers in the Manifest, are ascertained by the Bills of Lading to be persons, who acted principally as attorneys, managers, or agents, for those who are mentioned in the Bills to own the property for which the Bills are taken; the property in the Bills being in the general produce of such owners’ estates in
 
 Dominica.
 
 There is therefore no contradiction between the Manifest and Bills of Lading; for, the term shippers does not imply the property to be in such shippers; the term as properly applies to a factor, or attorney, or agent, as to the owner.
 

 But, it is said, Governor
 
 Duchilot
 
 was imposed upon; that “he refers in his Passport and Certificate, which is endorsed on the “Manifest, to the 17th article of the capitulation; that the 17th article “speaks of such merchants as have goods or merchandize; and that therefore the Governor must have been informed that the shippers were the owners of the cargo.”
 

 It is time the 17th article says, the merchants may fell their merchandize, and carry on their trade, and the term
 
 their
 
 implies the property to be in them: But the term
 
 their
 
 may also apply to the property which a factor, agent or attorney has the possession management and shipment of, for others; for, although they have not the general, yet they have the special, property.
 

 “ But, it is said, the shippers dared not to avow the names othe persons mentioned in the Bills of Lading, from a consciousness that they were not capitulants, and that the Governor would have refused them a Licence, Passport and Certificate.”
 

 If the shippers felt such a consciousness, why avow the names of such in the Bills of Lading? It was not only necessary to take measures to prevent discovery on the Island, but also to guard against detention on a capture at sea. Why was the Governors Passport and Certificate obtained? Was it not to protect
 
 the
 
 ship and cargo from capture? But if the Manifest, Passporand Certificate had no reference to the Bills of Lading, but were contradictory and inconsistent, and the persons avowed by the Bills of Lading to be, the owners of the property were not capitulants, is it not a novelty in the game of fraud, to furnish a ship with such papers as proclaimed a contradiction to the Manifest,
 
 *27
 
 Passport and Certificate, announced the criminality of the commerce, and exposed both ship and cargo to capture and confiscation?
 

 Prudence required, and very probably it was enjoined by the Government, that before a ship should be suffered to clear out, and proceed on her voyage, proofs should be made and taken with her, not only that the shippers of the cargo were capitulants, but also, that the owners of the cargo were capitulants. It appears in this case, that above three fourths of this cargo, were shipped by agents, and attornies and factors. The Governor certifies the shippers to be capitulants. The chief Justice certifies the owners to be capitulants, and where his certificates are deficient, the depositions prove it. All this may be done, in conformity to the law, usage and practice of the Island.
 

 But another contradiction is objected: It is said,
 
 "
 
 the Bills of Lading contradict the other Papers, which import the property of the ship to be in
 
 Brantlight & Son
 
 ; for the Bills consign the cargo to
 
 Brantlight &
 
 Son; and therefore it is contended, the property of the ship could not be in
 
 Brantlight & Son;
 
 because it is observed to direct a man to pay freight to himself. "The Bills of Lading are not chargeable with any such absurdity. The freight is not directed to be paid to
 
 Brantlight
 
 &
 
 Son
 
 ; the freight is to be paid to the captain; he is responsible for the wages of his crew, and other debts, contracted on account of the ship. Freight is answerable for all such claims, and the captain is entitled to receive it, to indemnify himself: He may, therefore, refuse to deliver the cargo, till the freight is paid. And by this means, in case of the bankruptcy of his owners, he is sure of an indemnification, to the extent of the freight.
 

 But still another contradiction is objected: It is said, "that both the Bills of Lading, and the oath of
 
 Morson,
 
 on the back of the Manifest, contradict the assertion of the other papers, that the ship is the property of
 
 Brantlight & Son
 
 : for, they prove the consignment of ship to
 
 Brantlight
 
 &
 
 Son
 
 ; and therefore, it is contended, the property could not be in them, because it is absurd to consign a ship to the owners.” We do not see any such absurdity. Consignment is a mercantile phrase, adopted to distinguish the person, to whole care a ship is addressed, and, when applied to the owners, it is merely in conformity to forms. It is the common usage and practice of merchants to apply, the phrase, indiscriminately, to owners, and others.
 

 "But, it is said, the papers found on board, the
 
 Resolution,
 
 do not sufficiently prove the ship to be the property of
 
 Brantlight & Son,
 
 when the arrived at
 
 St. Eustatius,
 
 from
 
 Amsterdam,
 
 early in 1780.” It is proved, by the oath of
 
 Morson,
 
 and captain
 
 Waterburgh,
 
 endorsed on the back of the Manifest, that this property
 
 *28
 
 was subsisting, if not at the time of the deposition, yet, at least, on the arrival of the ship at Dominica,
 
 October,
 
 1780. And
 
 Morson, & Company’s
 
 letter, to
 
 Brantlight & Son,
 
 dated
 
 6th
 
 March, 1781, after the rupture with
 
 Holland,
 
 and shortly before the ship left
 
 Dominica,
 
 and which was found on board proves the property to be then subsisting: for, in the close of the letter, they say,
 
 "captain
 
 Wate
 
 rburgh
 
 has drawn on you, in our favour, for disbursement, £191:15s;" which disbursement plainly refers to disbursements of the ship, which
 
 Brantlight & Son
 
 could not be chargeable with, if they had parted with the property, and were no longer owners.
 

 No evidence at all is produced to shew a change property, or transfer of the ship. And, therefore, the fact being admitted, that she was the property of
 
 Brantlight & Son,
 
 on her arrival at
 
 St. Eustatia,
 
 in 1780, and the property being proved to be subsisting in
 
 March,
 
 1781, and proved, to be subsisting in
 
 March,
 
 1781, a few days before the sailed from
 
 Dominica,
 
 we cannot doubt, but that the property was subsisting, at the time of her capture. She was then
 
 no
 
 prize to the
 
 British
 
 privateer; because protected by the
 
 British
 
 Proclamation: She was no prize to the
 
 America
 
 n privateer because she was the property of the subjects of the
 
 States General,
 
 a nation in peace and friendship with
 
 America.
 

 "But the papers, it is said, prove the cargo to be the property of persons, not capitulants: For
 
 Morson & Company,
 
 in their letter of the
 
 6th March,
 
 1781, speak of
 
 Kender Mason,
 
 as a shipper, who is not a capitulant.”
 

 What does this letter say? It is addressed to
 
 Brantlight
 
 &
 
 Son,
 
 and informs them, that the rupture with
 
 Holland,
 
 occasioned all shipments to stop; that afterwards, the
 
 British
 
 Proclamation, protecting the
 
 Holland
 
 vessels from capture, for a limited time, on their passage back from
 
 Dominica,
 
 came to hand; that even then, no one but
 
 Kender Mason
 
 and themselves would ship; that, afterwards, shipment went generally on.
 

 This letter proves clearly, that the cargo was shipped by many different persons. Not only
 
 Kender Mason
 
 shipped, but
 
 Morson & Company
 
 also shipped, and there were other shippers, who were alarmed, notwithstanding the
 
 British
 
 Proclamation, and would not immediately ship, though afterwards they proceeded to ship.
 

 To what extent did
 
 Kender Mason
 
 ship? Morson
 
 & Co’s
 
 letter, which is the only evidence that he shipt at all, goes no further than to prove, that he shipt a part of the cargo. How shall this part be ascertained?
 

 The ship, it is admitted, by counsel on both sides, was consigned to
 
 Morson & Co.
 
 and
 
 Alexander
 
 Henderson; and it appears from the papers on board, that upwards of two thirds of
 
 *29
 
 the cargo were shipt by
 
 Henderson,
 
 as agent and attorney for the
 
 British
 
 capitulants; the residue of the cargo was shipt, partly by
 
 James Morson,
 
 agent and attorney for
 
 British
 
 capitulants, partly by
 
 Morson
 
 &
 
 Co.
 
 and partly by others, in their own right, as agents and attornies for others.
 

 The letter of correspondence, which
 
 Henderson
 
 addressed to
 
 Brantlight & Son,
 
 to whom the ship and cargo were consigned, and his letters of correspondence, addressed to the gentleman at London, for whom he was agent and attorney; the bill of lading he took for the property shipt, and his deposition annexed to the said bill, give a fair history of such part of the cargo, as was shipt by him: They prove it to be the property of
 
 British
 
 capitulants, and not the property of
 
 Render Mason.
 

 The depositions of
 
 James
 
 Morson, the bills of lading, and thcertificates of the Chief Justice, point out and ascertain, what part of the cargo he shipt as agent and attorney, and prove it to be the property of
 
 British
 
 capitulants, and not the property of
 
 Kender Mason.
 

 The depositions, bills of lading; manifest, letters of correspondence, the Governor’s passport and certificate, and the deposition of
 
 Morson
 
 and
 
 Fitzgerald
 
 prove that the residue of the cargo, except what was shipt by
 
 Morson,
 
 &
 
 Co. Morson,
 
 Vance,
 
 & Co.
 
 and
 
 Lovel, Morson
 
 &
 
 Co.
 
 was the property of
 
 British
 
 capitulants, and not the property of
 
 Kender
 
 Mason.
 

 If Mason, then, had any property on board, that property must have been in such parts of the cargo as were shipt by
 
 Morson, & Co. Vance, & Co.
 
 and
 
 Lovel, Morson, & Co.
 
 With regard to this part of the cargo, the evidence is not full and compleat: For, altho’
 
 Morson
 
 is proved to be a capitulant, yet the company is neither ascertained, nor proved to consist of capitulants.
 

 But it is contended, that the property shipt by
 
 Henderson
 
 was the property of
 
 Kender Mason.
 

 On what ground is the idea taken up, that
 
 Mason
 
 had any property at all on board? It is founded solely on that part of
 
 Morson
 
 &
 
 Co.'s,
 
 letter, which mentions
 
 Kender Mason
 
 as a Shipper. Exclusively of this letter, there is nothing, besides mere conjecture and possibility, to prove that he had any property at all on board.
 

 This much much be clear; that if
 
 Henderson
 
 was meant, then
 
 Mason
 
 was not meant.
 

 Morson
 
 &
 
 Co.
 
 say in their letter,
 
 "
 
 that even after the arrival "of the
 
 British
 
 proclamation, no one but
 
 Kender
 
 Mason, and "ourselves, would immediately ship.” If
 
 Henderson
 
 was not meant for
 
 Kender Mason,
 
 then
 
 Henderson
 
 was amongst those who ware still alarmed, and would not immediately ship, on the arrival of the
 
 British
 
 proclamation; and, consequently,
 
 Kender Mason
 
 could have no property in what was shipt by
 
 Henderson:
 
 
 *30
 
 for it is absurd to say, that
 
 Kender Mason
 
 proceeded to ship, and
 
 Henderson
 
 did not, if what
 
 Henderson
 
 shipt was the property of
 
 Kender Mason.
 

 But, it is objected, "that altho’
 
 Kender Mason
 
 is mentioned in the letter, as a shipper, yet it is to be understood, that he is there described as principal to Henderson, and therefore, what was shipt by
 
 Henderson,
 
 may with propriety be said to have been, shipped by
 
 Kender Mason.”
 

 What evidence, is there of such a connection between
 
 Mason
 
 and
 
 Henderson? Mason's
 
 letters of correspondence are all addressed to Morson, and the ship is consigned to
 
 Morson
 
 and
 
 Henderson,
 
 as persons in separate and distinct interests. The idea too, of such a connection, is contradicted by the whole tenor of the papers found on board.
 

 If
 
 Henderson
 
 was the agent, or attorney for
 
 Kender Mason;
 
 if he was the person, with whom
 
 Mason
 
 was so extensively interested, in his commercial connections, then the idea of his connection with
 
 Morson & Co. Morson,
 
 Vance, &
 
 Co.
 
 and
 
 Lovel, Morson,
 
 &
 
 Co.
 
 ought to be abandoned: for, it is not to be believed, that
 
 Mason
 
 should engage in three partnerships, and yet employ an agent or attorney, who ships forty times, the quantity of produce shipt by all the three partnerships.
 

 But it is contended, “that both ship and cargo are the property of
 
 Morson
 
 and
 
 Mason,
 
 in consequence of a plan concerted at
 
 London,
 
 between
 
 Kender Mason
 
 and
 
 Hesbuysen,
 
 agent for
 
 Brantlight
 
 &
 
 Son,
 
 while the Ship
 
 Resolution
 
 lay at
 
 Eustatius."
 

 We have no doubt the voyage of the
 
 Resolution
 
 was planned at
 
 London,
 
 by
 
 Kender Mason
 
 and
 
 Hesbuysen; but
 
 the plan must at have been very different from the one suggested.
 

 One of two propositions must be true; either
 
 Morson
 
 and
 
 Mason
 
 did not purchase the ship, and ship the cargo, in consequence of the plan suggested, or
 
 Morson
 
 has sworn falsely, and committed a perjury.
 

 Morson,
 
 the 7th March,
 
 17
 
 81, near twelve months after the
 
 Resolution’s
 
 voyage was concerted at
 
 London,
 
 swears that the Ship
 
 Resolution,
 
 belonging to the port of
 
 Rousseau,
 
 and owned by
 
 Brantlight
 
 &
 
 Son,
 
 arrived at
 
 Dominica, Oct.
 
 1780; for the purpose of taking on board a cargo of sugar and coffee, the property of capitulants.
 

 This oath flatly contradicts the assertion, that the Ship was purchased; it also directly contradicts the assertion, that the plan was to ship a cargo, the property of
 
 Kender
 
 Mason; for
 
 Kender Mason
 
 is not a capitulant.
 

 Morson's
 
 knowledge was competent to the facts he swore: He precisely knew what the plan was that was really concerted at London; for, it is strenuously contended by the counsel for the captors, that
 
 Kender Mason,
 
 in his letter
 
 to Morson
 
 
 *31
 
 & Hesbuysen, enclosed to
 
 Waterburgh,
 
 contained a full communication of it.
 

 " But the papers, it is said, found on board the
 
 Eustin,
 
 throw "great light upon the subject; they pluck off the mask, and "exhibit Ma
 
 son
 
 in his proper colours; they prove, that an illicit "commerce has taken place, and that the articles of capitulation "have been repeatedly violated.”
 

 Admit, for argument sake, the fact, that the
 
 Eustin
 
 was engaged in an illicit commerce, how can the conduct of the
 
 Eustin
 
 affect the
 
 Resolution
 
 ?
 

 But what is this illicit commerce, which is charged to have taken place ? Let it be ascertained, and we shall find, it cannot possibly apply to the
 
 Resolution.
 

 " British
 
 goods, it is said, have been shipt
 
 from London, to " Dominica,
 
 thro’ the intervention of neutral ports.” Can this species of illicit commerce apply to the
 
 Resolution
 
 ? It is impossible; for she was never engaged in this
 
 Dominica
 
 trade, till after her arrival at
 
 Eustatia,
 
 early in 1780 ; and from thence she sailed to
 
 Dominica,
 
 where she lay, till the rupture between
 
 Great Britain
 
 and
 
 Holland
 
 took place; nor were
 
 Brantlight
 
 and
 
 Son
 
 ever engaged in such a commerce for
 
 Morson
 
 and
 
 Co’s.
 
 letter, of the 6th March 1781, after the rupture, speaks of this house, as a new house, with which the people of
 
 Dominica
 
 were unacquainted; and mentions the difficulties he had, from that circumstance, to procure consignments.
 

 "But the papers, it is said, of the
 
 Eustin
 
 prove that the "produce of
 
 Dominica
 
 has been exported to
 
 London,
 
 through "the intervention of neutral ports.”
 

 Was the
 
 Resolution
 
 ever engaged in this species of illicit commerce? The peculiar circumstances of her case shew, that she never was. The rupture with
 
 Holland
 
 took place while she lay at
 
 Dominica
 
 ; it stopped all shipments. On the arrival of the British proclamation, protecting
 
 Holland
 
 vessels, for a limited time, on their passage back, shipments went on; but the protection, which the proclamation gave, ceased on the arrival of
 
 Holland
 
 vessels back to their ports in
 
 Holland.
 

 What ground then is there to think, that the
 
 Resolution,
 
 with her cargo, were destined, after her arrival
 
 at Amsterdam,
 
 to proceed to
 
 London,
 
 where both ship and cargo, would have been liable, after her departure from
 
 Amsterdam,
 
 not only to
 
 British
 
 capture; but, as contended by the counsel for the captors, liable also to
 
 Dutch
 
 capture, war prohibiting all commerce between the belligerent powers; and not only liable
 
 to British
 
 and
 
 Dutch
 
 capture; but, as the law of nations has been stated by the counsel of the captors, liable also to
 
 French, Spanish
 
 and
 
 American
 
 capture?
 

 “
 
 But the papers, it is said, of the
 
 Eustin,
 
 prove that
 
 Mor
 
 -
 
 "son
 
 and
 
 Mason,
 
 who planned the voyage of the Resolution,
 
 *32
 
 "also planned the voyage of the
 
 Eustin;
 
 and therefore, if the
 
 "Eustin
 
 was engaged in an illicit commerce, the presumption is, that the
 
 Resolution
 
 was also employed in such commerce.’’
 

 We have already observed, that the
 
 Resolution
 
 could not possibly be engaged in the illicit commerce, with which the
 
 Eustin
 
 is charged; but if
 
 Morson
 
 and
 
 Mason
 
 planned both voyages,
 
 Morson
 
 knew the plan on which the
 
 Resolution
 
 was chartered, and he has proved it, on oath, to be a fair one, and in perfect conformity to the articles of capitulation.
 

 “ But
 
 Mason,
 
 in his letter
 
 from Ostend,
 
 August 1781, found "on board the
 
 Eustin,
 
 writes to Moreson, that he has nearly
 
 "
 
 accomplished the plan, which he informed him of in his letter
 
 "
 
 dated October 1780, from Rotterdam, and it is contended, "that this letter proves, that a plan is established at
 
 Ostend,
 
 to
 
 "
 
 centre there the whole
 
 Dominica
 
 trade, and to furnish
 
 British
 
 "goods for
 
 Dominica,
 
 through that channel.” Admit the facts to be so; how does it affect the
 
 Resolution
 
 and her cargo? The rupture with
 
 Holland
 
 had taken place, and the
 
 Resolution
 
 was captured, and brought into port, several months before the plan was accomplished at
 
 Ostend
 
 and, consequently, whatever illicit practice that plan points at, cannot apply to the
 
 Resolution.
 
 But it is said, that the plan established
 
 at Ostend,
 
 was the plan, which was concerted at London, and established at
 
 Amsterdam,
 
 and
 
 Rotterdam,
 
 and shifted from those cities to
 
 Ostend,
 
 on account of the rupture with
 
 Holland.
 
 If the plan, now established at
 
 Ostend,
 
 is nothing more than the plan adopted at London, with regard to the
 
 Resolution,
 
 then it is a fair one; for
 
 Morson
 
 has told us, what the plan was, and he has declared it on oath. But we are of opinion, that the system, now established at
 
 Ostend,
 
 is nothing more than the plan adopted
 
 at London, with
 
 regard to the
 
 Resolution:
 
 Then it is a fair one;
 
 for
 
 Morson has told us, what the plan was, and he has declared it on oath. But we are of opinion, that the system now established at
 
 Ostend
 
 is a new one, and that it is not a former plan, shifted from
 
 Holland
 
 to
 
 Ostend,
 
 on account of the rupture. It originated indeed before the rupture, and might have taken place in
 
 Holland,
 
 had it been completed before that event. It is of such a nature as requires
 
 Morson
 
 to take his residence at
 
 Ostend.
 
 It occasioned a change, in his commercial connection
 
 at London,
 
 and a dissolution of the partnership, in which he was there engaged. The cargoes shipped from
 
 Dominica,
 
 tho’ consigned to
 
 Liber, Baas, Derd & Co.
 
 were nevertheless to be disposed of, under his superintendancy. It was upon this plan, whatever it was, that the
 
 Eustin
 
 failed; she may be affected by it, but the
 
 Resolution
 
 never can. We have said, the whole cargo of the
 
 Resolution
 
 is disproved to be the property of
 
 Mason,
 
 except such parts of it as were shipt by
 
 Morson
 
 &
 
 Co.
 
 and therefore if
 
 Mason
 
 had any property any property at all on board, it must be in such part of the cargo.
 

 
 *33
 
 We feel the force of the reasoning which has been employed to shew, that the name of
 
 Kender Mason
 
 was inserted by mistake; but, as Mason, who appears to us to be a partner in three partnerships, and to have been the active person in shipping this part of the cargo, has acknowledged, for himself and company, that
 
 Kender Mason
 
 was a shipper, and the evidence, upon a careful review of it, leaves an opening to apply that acknowledgment to a concern in the three partnerships, we are led to change the opinion we had entertained on the first argument, with regard to this point, and now think, that this part of the cargo must be condemned as prize; and, not only
 
 Mason’s
 
 proportion of it, but also the whole interest of the three partnerships: For, the shipping of produce by Mason, who is not a capitulant, is a violation of the capitulation; and as the three partnerships were consenting to it, and neglected their interest with
 
 Mason,
 
 they are
 
 participes
 
 criminis, and must equally suffer. So far we have thought proper to animadvert on the new evidence, and the argument and observations of the counsel upon it. And, altho’ on a decree of acquittal, almost the whole cargo will go into the hands of those who are not the friends of America, notwithstanding they have stipulated a neutrality during the war; yet, as they are entitled to it, by the articles of capitulation which bind America, the law of nations operating on those articles as a solemn compact, commands that such a decree must be given. We hope we feel just impressions of the wrongs and cruelties of
 
 Great Britain;
 
 but public faith must be maintained; the honor and dignity of the
 
 United States
 
 preserved, and the law of nations dispassionately and righteously administered.
 

 We therefore adjudge and decree, that the order of this court, suspending the original decree, be discharged, and the said original decree, be affirmed in all its parts, except with regard to such parts of the cargo, as were shipt by
 
 Morson
 
 &
 
 Co.
 
 Morson, Vance, &
 
 Co.
 
 and
 
 Lovell, Morson & Co.
 
 which parts of the cargo we do adjudge and decree to be condemned, for the use of the captors, chargeable, nevertheless, with the stipulated freight.