[J-104-2019] [MO: Baer, J.]
IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 37 MAP 2018 |
| | : | |
| Appellant | : | Appeal from the Order of Chester |
| | : | County Court of Common Pleas, |
| | : | Criminal Division, dated July 10, |
| v. | : | 2018 at No. CP-15-CR-1570-2016 |
| | : | |
| | : | ARGUED:  November 20, 2019 |
| GEORGE J. TORSILIERI, | : | |
| | : | |
| Appellee | : | |

**DISSENTING OPINION**

JUSTICE DONOHUE                                          DECIDED:  June 16, 2020

"It would be easy enough to let this case go.  After all, sex offenders are one of the most disfavored groups in our society." *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2144 (Gorsuch, J., dissenting).  And it would be easy enough to put off our decision for another day by remanding for further development of Torsilieri's challenges to the legislative finding that prompted the General Assembly to enact SORNA: that "[s]exual offenders pose a high risk of committing additional sexual offenses . . ."  42 Pa.C.S. § 9799.11(a)(4).  I respectfully dissent from the learned Majority's disposition because a remand is not necessary.  The Commonwealth stipulated to the content but not validity or relevance of three affidavits from experts retained by Torsilieri, which establish that sexual offenders do not recidivate at anywhere near the rates accepted by the courts in upholding registration laws.  Despite having months to prepare for an evidentiary hearing

on that point, the Commonwealth declined to present any contrary evidence. The Majority forgives "the Commonwealth's tactics at the post-sentence hearing that potentially prevented the necessary development of the record" because Torsilieri bears a heavy burden in challenging SORNA's constitutionality. Majority Op. at 43. Even accepting that as a valid excuse, I would examine the sources raised in its reply brief. The Commonwealth's competing evidence agrees that the precedents reflexively accepting the high degree of recidivism for sexual offenders as a guidepost for legal analysis about these challenges are mistaken. Instead, the Commonwealth shifts to a different argument to justify the revisions to SORNA, that sex crimes are underreported and therefore the true recidivism rate is unknown. While I do not doubt that sex crimes are underreported for a variety of reasons, I would hold that due process precludes the General Assembly from presuming that all persons convicted of one of the approximately thirty crimes mandating registration pose a high risk of committing additional sexual offenses. As a matter of due process, this is an unconstitutional irrebuttable presumption that implicates the constitutional right to reputation. As SORNA already requires individualized assessments to determine whether the offender is a sexually violent predator ("SVP"), I agree with Torsilieri that this existing procedure demonstrates that a reasonable alternative exists to ascertain the relevant fact of risk of reoffending. I would thus affirm the trial court.

The United States Supreme Court first addressed sexual offender registration laws in *Smith v. Doe*, 538 U.S. 84 (2003), wherein it remarked that "Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism." *Id.* at 103. To support this proposition, the Court quoted its decision in *McKune v. Lile,* 536

U.S. 24, 34 (2002), to establish that "[t]he risk of recidivism posed by sex offenders is 'frightening and high,'" and further noted that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." 536 U.S. at 33. *See Commonwealth v. Williams*, 832 A.2d 962, 979 (Pa. 2003) (noting that legislative findings in prior version of SORNA "are consistent with grave concerns over the high rate of recidivism among convicted sex offenders.").

This Court has recognized that other evidence suggests the danger of recidivism was perhaps overstated by *Smith*. In *Commonwealth v. Muniz*, 164 A.3d 1189, 1192 (Pa. 2017) (holding that SORNA violates the *ex post facto* clause of Pennsylvania Constitution), we noted the existence of conflicting studies regarding recidivism rates among sexual offenders when discussing whether SORNA promotes traditional aims of punishment like deterrence and retribution. The Commonwealth acknowledged that SORNA has that effect but urged this Court to find SORNA non-punitive because a contrary conclusion "would undermine the state's ability to regulate offenders and the risk of recidivism is too great a price to pay." *Id.* at 1214. The Commonwealth, as here, argued that "because of contrasting studies and real recidivism concerns, this Court should be wary of . . . contrary conclusions." *Id.* at 1215. See *also Commonwealth v. Butler*, ___ A.3d ____, 2020 WL 1466299, at *15 (Pa. Mar. 26, 2020) (describing an "apparent conflict" regarding the recidivism rate among sexual offenders and whether registries are effective in preventing recidivism). We have therefore acknowledged that SORNA may sweep too broadly by saddling too many offenders with onerous registration obligations. But we have to date insulated SORNA from such challenges on the grounds that the

legislative branch properly resolves such policy questions. And it is easy enough to defer to those findings, however questionable, given the visceral reaction to guarding the rights of sexual offenders.

The validity of those findings was directly at issue in this case, and the Commonwealth asks us to again disfavor those offenders by deferring to the General Assembly's policy judgments. I join the Majority's refusal to do so as I agree that Torsilieri "poses colorable constitutional challenges to Revised Subchapter H's registration and notification provisions" based upon his challenges to the determination that all sexual offenders pose a high risk of recidivation and that SORNA's tier-based classification system protects the public from those dangers. Majority Op. at 23. The Majority cogently summarizes the research offered by Torsilieri attacking those two determinations:

> Appellee first presents a body of research indicating that adult sexual offender recidivism rates have been improperly exaggerated, including through citations by this Court and the United States Supreme Court. As an example, he references the Courts' repeated declaration that sexual offenders have a "frightening and high" risk of recidivism, which in turn provided support for upholding various iterations of sexual offender registration systems. Appellee Brief at 17 (citing *Smith*, 538 U.S. at 103 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002))); *see also Lee*, 935 A.2d at 882. Appellee claims that this oft-quoted language derives not from rigorous scientific evidence but from an unsupported claim in "a 1988 National Institute of Corrections training manual, which in turn cited a 1986 Psychology Today article written for a lay audience." Appellee Brief at 17 (citing Ira Ellman and Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015)). He cites substantial recent evidence undermining this claim.

> * * *

> Nevertheless, we are unable to conclude based upon the record currently before this Court whether Appellee has sufficiently undermined the validity of the legislative findings supporting Revised Subchapter H's registration and

> notification provisions, especially in light of the contradictory scientific evidence cited by the Commonwealth during this appeal which may refute the Appellee's experts. It is not the role of an appellate court to determine the validity of the referenced studies based on mere citations rather than allowing the opportunity for the truths to develop through a hearing on the merits of the evidence. Accordingly, a remand is appropriate to allow the parties to address whether a consensus has developed to call into question the relevant legislative policy decisions impacting offenders' constitutional rights.

*Id.* at 23-24.

The Commonwealth stipulated to this evidence, including the conclusion that "[t]he simple fact is that the risk level, for nearly everyone on the registry, is nowhere near the 'frightening and high' rate assumed by *Smith* and *McKune* and all the later decisions that rely on them." Ira Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495, 507 (2015). I find that we have a sufficient record to dispense of these challenges one way or the other, as prior decisions have already given the Commonwealth the benefit of the doubt on this score. In *Muniz*, we concluded that the prior version of SORNA was punitive notwithstanding the existence of conflicting scientific evidence. Therefore, the lack of consensus on the recidivism danger posed by sex offenders has already been construed in the Commonwealth's favor. Had this Court concluded in *Muniz* that the competing studies go against the Commonwealth, the conclusion that SORNA was punitive would have been even stronger. I therefore reject the Majority's suggestion that the trial court failed to consider evidence contradicting Torsilieri's experts. That point is already built into our existing law, and in context, the trial court's order represents a legal conclusion that the strength of Torsilieri's evidence renders SORNA constitutionally repugnant.

At this juncture, I note that Torsilieri presented arguments against SORNA under both due process grounds and as challenges to the constitutionality of revised Subchapter H's imposition of punishment. The trial court declared the statute unconstitutional both facially and as-applied to Torsillieri on all grounds. Placing the challenges into either framework sets this Court down different paths here and on remand. In *Muniz*, we held that SORNA violated the *ex post facto* clause of the Pennsylvania Constitution when applied retroactively. In this case, Torsilieri had notice of his registration obligations, as he committed his crimes after SORNA's effective date.[1] If those obligations, including the lifetime registration period, are construed as punishment then the SORNA requirements may well be constitutionally permissible. In *Smith*, the United States Supreme Court held that Alaska's sexual offender registration statute was non-punitive and could therefore be applied retroactively. Justice Stevens filed a dissent, concluding that the requirements were punitive in nature. Of note here, Justice Stevens opined that the obligations could be imposed as part of the punishment for offenses committed after the statute's enactment:

> I think it equally clear, however, that the State may impose registration duties and may publish registration information as a part of its punishment of this category of defendants. Looking to the future, these aspects of their punishment are adequately justified by two of the traditional aims of punishment—retribution and deterrence. Moreover, as a matter of procedural fairness, Alaska requires its judges to include notice of the registration requirements in judgments imposing sentences on convicted sex offenders and in the colloquy preceding the acceptance of a plea of guilty to such

---

[1] I note for clarity's sake that the applicable SORNA requirements changed in between commission of the crime and sentencing. Those changes are irrelevant to the notice issue because Torsilieri had notice of the penalties that were examined in *Muniz*. Thus, if the Commonwealth is correct that the obligations may be imposed on Torsilieri because he had notice, any change in the law would work to his favor by lessening the obligations.

> an offense. *See* Alaska Rules Crim. Proc. 11(c)(4) and 32(c) (2002). Thus, **I agree with the Court that these statutes are constitutional as applied to postenactment offenses.**
>
> Accordingly, I would hold that the Alaska statute violates the constitutional prohibition on ex post facto laws. Because I believe registration and publication are a permissible component of the punishment for this category of crimes, however, for those convicted of offenses committed after the effective date of such legislation, there would be no separate procedural due process violation so long as a defendant is provided a constitutionally adequate trial.

538 U.S. at 114 (Stevens, J., dissenting) (emphasis added).

These observations may be correct, and as the Commonwealth explains, the United States Supreme Court has upheld statutory schemes that call for draconian mandatory penalties. *See*, *e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 961 (1991) (holding that statute calling for mandatory life imprisonment without parole for possessing more than 650 grams of cocaine did not constitute cruel and unusual punishment); *Ewing v. California*, 538 U.S. 11 (2003) (upholding sentence of mandatory life imprisonment for theft of three golf clubs valued at $399 apiece under "three strikes" law). These schemes are valid because the proportionality of the punishment to the offense is generally of no constitutional concern. *See Graham v. Florida*, 560 U.S. 48, 59–60 (2010) (stating that the controlling opinion in *Harmelin* "concluded that the Eighth Amendment contains a narrow proportionality principle") (quotation marks and citation omitted). The common example of a punishment that would violate the narrow proportionality principle is "ma[king] overtime parking a felony punishable by life imprisonment," *Rummel v. Estelle*, 445 U.S. 263, 274 n.11 (1980).

Beyond those extreme cases, the exceptions to the rejection of assessing proportionality between the crime and authorized punishment appear limited to children

and the death penalty. In *Miller v. Alabama*, 567 U.S. 460 (2012), which held that juveniles could not receive a sentence of mandatory life imprisonment without parole, the Court rejected *Harmelin* as foreclosing relief. "*Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children." *Id.* at 481. As discussed infra, this division between children and adults was invoked by this Court in the sexual offender context. There is thus reason to believe that the lifetime registration punishments could be imposed as punishment for sexual offenses committed by adults as a general matter. Whether revised Subchapter H now qualifies as punishment is a matter of dispute in this case, but even if it is punitive the obligations are plainly less restrictive than actual incarceration. Whatever may be said of the wisdom of such laws, the host of obligations do not approach imposing a life sentence for parking violations.

The Commonwealth asks us to uphold the statute on the grounds that even if revised Subchapter H is punitive it remains constitutional because the General Assembly could have authorized registration obligations as criminal penalties.[2] Had the legislature done so, such punishments would doubtlessly be challenged on other grounds, as reflected in the parties' competing arguments regarding whether, inter alia, the punishments would be subject to the holding in *Alleyne v. United States*, 570 U.S. 99

---

[2] SORNA limits the trial judge's role to one of informing the offender of his or her obligations, 42 Pa.C.S. § 9799.20, and nothing in the Sentencing Code authorizes the judge to impose SORNA obligations as part of the criminal sentence. 42 Pa.C.S. § 9721. Thus, for SORNA obligations to qualify as a criminal sentence, we would have to hold that such obligations are authorized as implicit mandatory minimums that exist outside of the normal sentencing process.

(2013), that facts increasing the mandatory minimum sentence must be submitted and proven to the fact-finder beyond a reasonable doubt.

I would reject the notion that the trial court may be reversed on this basis by crediting the General Assembly's stated intent not to impose punishment. While I have previously expressed skepticism on that point owing to the evolution of the registration laws to expand the focus from sexually violent predators to sexual offenders, *see Commonwealth v. Perez*, 97 A.3d 747, 760-63 (Pa. Super. 2014) (Donohue, J., concurring), the revisions set forth in Subchapter H were explicitly adopted to address our decision in *Muniz*. As the Majority observes, "the General Assembly has repeatedly reenacted the unambiguous statement that the purpose of the registration and notification provisions 'shall not be construed as punitive.'" Majority Op. at 30 (quoting 42 Pa.C.S. § 9799.11(b)(2)). The Commonwealth has likewise maintained throughout this litigation that the requirements struck as unconstitutional by the trial court do not amount to punishment. *See* Attorney General's Brief at 12 ("The General Assembly passed Acts 10 and 29 in direct response to *Muniz* and *Butler*, clarifying that the sex offender registration provisions were non-punitive collateral consequences of the original conviction"); *id.* at 18 ("Act 29 is not punitive and does not require a judge to determine additional facts. All that is required is conviction for an enumerated offense."); *id.* at 23 ("But mere collateral consequences are not punishment. And committing any crime nearly always results in lost opportunities."). Accordingly, I would simply elect not to examine whether revised Subchapter H may be alternatively upheld as authorizing punishment. It is sufficient to observe that the General Assembly has declined to take that route and we should not authorize a punishment that the General Assembly declined to enact.

Returning to any purpose to be served by a remand, the most favorable scenario for the Commonwealth is that the trial court agrees that the scientific evidence points in both directions. As discussed, *Muniz* already gave the Commonwealth the benefit of that doubt. Thus, giving the Commonwealth another opportunity to present more evidence on that point would almost certainly not change the outcome. The Majority opines it is possible that the trial court's determination that Subchapter H is punitive may change based on reweighing several of the *Mendoza-Martinez*[3] factors that govern whether a statute is so punitive in effect as to negate the stated intent to establish a civil scheme. I need not belabor my disagreement with the Majority on some of these points. I observe only that if the trial court concludes on remand that SORNA is punitive, we will still be required to address the Commonwealth's claim that the obligations may be imposed nonetheless because Torsilieri had notice of the penalties. Accordingly, a remand is likely to cause unnecessary delay as we will have to resolve the punishment question.

As stated, I believe that the trial court should be affirmed. For these purposes, I assume arguendo that Subchapter H is non-punitive. As urged by Torsilieri I would extend the holding of *In re J.B.,* 107 A.3d 1 (Pa. 2014), to adult offenders. In *J.B.*, the parties had stipulated to research "indicat[ing] that recidivism rates for juvenile sex offenders are far lower than the recidivism rates of adult sexual offenders and, instead, are comparable to non-sexually offending juveniles." *Id.* at 10. The trial court found that the statute violated due process because it applied an irrebuttable presumption "that the adjudication of a specified sexual crime equates to high risk of recidivism requiring registration." *Id.* The irrebuttable presumption doctrine requires three conditions: (1)

---

[3] *Kennedy v. Mendoza–Martinez*, 372 U.S. 144 (1963).

whether there is an interest protected by the due process clause encroached by an irrebuttable presumption; (2) whether the presumption is universally true; and (3) whether a reasonable alternative means exists for ascertaining the presumed fact. *Id.* at 15-16.

We found that the first criterion was met as to juvenile offenders. SORNA is "premised upon the presumption that all sexual offenders pose a high risk of recidivating, [which] impinge[s] upon juvenile offenders' fundamental right to reputation as protected under the Pennsylvania Constitution." *Id.* at 17. Second, the presumption is not universally true. For that conclusion we relied upon the stipulated studies establishing that juveniles who commit sexual offenses do so due to impulsivity and sexual curiosity, traits which diminish with age. The *J.B.* Court contrasted juveniles to adults on that point: "While adult sexual offenders have a high likelihood of reoffense, juvenile sexual offenders exhibit low levels of recidivism (between 2–7%), which are indistinguishable from the recidivism rates for non-sexual juvenile offenders, who are not subject to SORNA registration."[4] *Id.* We also cited *Miller*, supra, as establishing that juveniles are fundamentally different than adults. Finally, addressing whether an alternative process could be used to establish the requisite fact of likely recidivism, we stated that one already exists. "A reasonable alternative, in fact, is already in use in Pennsylvania under SORNA. As discussed *supra*, SORNA provides for individualized assessment for all sexual offenders . . . for designation of sexually violent predators." *Id.* at 19 (internal citation

---

[4] One of Torsilieri's sources noted that our comparison was mistaken because it "compares juveniles to *all* adults, making no distinction among adult registrants. The Hanson study finds the re-offense rate for low and moderate-risk offenders, who probably account for *most* adults on the registry, is within the same 2-7% range the court attributes to juveniles." Ira Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495, 507 (2015).

omitted). We concluded that "[a] similar process could be utilized to assess which juvenile offenders are at high risk to recidivate." *Id.*

The Commonwealth avers that *J.B.* should not apply because the requisite due process concerns were satisfied by Torsilieri's conviction at trial. I am aligned with the Majority's apparent rejection of the claim that SORNA obligations may be imposed as collateral consequences stemming from the conviction itself. That question relates back to some degree to the question of whether Subchapter H remains punitive because the determination of whether obligations are civil often arises, as in *Muniz* itself, in tandem with the question of whether the requirements may be applied retroactively. *See e.g.*, *Lehman v. Pennsylvania State Police*, 839 A.2d 265, 270 (Pa. 2003) (upholding denial of firearm purchase based on application of regulation enacted well after disqualifying conviction; "the issue becomes whether the civil disability imposed on appellant—the inability to purchase firearms—constitutes punishment."). *See also Muniz*, 164 A.3d at 1238 n.6 (Saylor, C.J., dissenting) ("Although the *Mendoza–Martinez* factors are the prevailing framework for determining the punitive effect of a statutory enactment, a number of scholars and jurists have expressed significant reservations with their use relative to assessing collateral consequence laws, such as SORNA.") (collecting commentary). The General Assembly may lawfully impose civil consequences due to a conviction and such claims are not thought to implicate the irrebuttable presumption doctrine. Thus, for example, "loss of driving privileges is a civil collateral consequence of a conviction for underage drinking[.]" *Commonwealth v. Duffey*, 639 A.2d 1174, 1176 (Pa. 1994). And the validity of imposing those consequences does not require proof that the establishment of one fact (e.g. underage drinking) bears on the consequence of the

other (i.e. a person convicted of underage drinking is a dangerous driver). The conviction is enough. I therefore find it significant that *J.B.* applied the irrebuttable presumption doctrine without assessing whether SORNA constituted punishment. *J.B.*, 107 A.3d at 12 n.21 ("The Commonwealth additionally contests the trial court's determinations that SORNA is violative of the *ex post facto* clause . . . . As we find SORNA unconstitutional based upon its use of an irrebuttable presumption, we do not recite the Commonwealth's arguments on the other constitutional issues."). The inescapable conclusion drawn from *J.B.* is that SORNA unconstitutionally impaired juveniles' constitutional right to reputation. While collateral consequences may infringe on rights, infringement of the constitutional right to reputation requires a corresponding greater justification. We explained the magnitude of the right to reputation in *In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 715 (Pa. 2018):

> In our prior opinion authored by Chief Justice Saylor, we stressed that an individual's right to his or her personal reputation was regarded by the framers of our organic charter as a fundamental individual human right — one of the "inherent rights of mankind." *Grand Jury I,* 190 A.3d at 573. For that reason, throughout our Commonwealth's history, it has been accorded the same exalted status as other basic individual human rights, such as freedom of speech, freedom of assembly, and freedom of the press. Thus, as with all legal proceedings which affect fundamental individual rights, the judicial branch serves a critical role in guarding against unjustified diminution of due process protections for individuals whose right of reputation might be impugned.

*Id.* at 715 (footnote omitted).

Along these same lines the Commonwealth also suggests that applying *In re J.B.* to adult offenders would conflict with the United States Supreme Court's decision in *Connecticut Dep't of Public Safety v. Doe,* 538 U.S. 1 (2003), decided the same day as

*Smith* and rejecting a similar due process challenge as raised here. Doe, who was convicted of a sexual offense, argued that Connecticut's registration and publicization of his information "deprive[d] him of a liberty interest—his reputation combined with the alteration of his status under state law—without notice or a meaningful opportunity to be heard." *Id.* at 6 (citation omitted). The Court of Appeals agreed with Doe that due process required a hearing to determine whether or not Doe was likely to be currently dangerous as a condition of registration. *Id.* The Court reversed, finding that dangerousness was not relevant to the statutory scheme and therefore no hearing was needed. Accordingly, the fact Doe sought to establish would make no difference. "[E]ven if respondent could prove that he is not likely to be currently dangerous, Connecticut has decided that the registry information of *all* sex offenders—currently dangerous or not—must be publicly disclosed." *Id.* at 7.

The Attorney General suggests that *J.B.* would have come out the other way had this Court addressed *Doe.* The Attorney General argues that we "assumed that the policy judgment that sexual offenders, as a cohort, pose a risk of recidivating was material to the structure of SORNA. Respectfully, it was not." Attorney General's Brief at 39. More significantly, the Attorney General states that in *J.B.* we were "neither presented with, nor addressed, [*Doe*]. Had it done so, this Court would have determined that, like *Connecticut*, an individualized assessment of future dangerousness was not material to the statutory scheme in SORNA and, thus, the Irrebuttable Presumption Doctrine did not apply." *Id.*

The Majority properly rejects this premise. The *J.B.* Court found that recidivation was the lynchpin of SORNA. Absent overruling *J.B.*, I submit that we are required to

follow its ascertainment of legislative intent. Therefore, with respect to the first factor, SORNA infringes upon the protected interest of reputation.[5]

As to whether that presumption is universally true, we have not applied this requirement literally; the existence of even one exception to the presumed fact would definitively establish a lack of universality. Thus, the government seems to be given some leeway based on the strength of countervailing governmental interests. Unsurprisingly, the Commonwealth asks this Court to hold that the presumption is universally true simply because the General Assembly says it is so. "The General

---

[5] The High Court in *Doe* stated, "even assuming, *arguendo,* that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." 538 U.S. at 7. Thus, the Court found that the deprivation of a protected liberty interest would not have mattered.

I do not perceive that extending *J.B.* to adult offenders would conflict with *Doe*. Related to this point, the Majority declines to determine whether the irrebuttable presumption doctrine should be examined under substantive due process or procedural due process principles, citing our statement in *DOT, Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060, 1066 (Pa. 1996),"we do not believe it wise to pigeonhole whether an analysis of an irrebuttable presumption is solely one of substantive or procedural due process." The *Doe* Court remarked that the offender's claim "is actually a substantive challenge . . . recast in procedural due process terms." 538 U.S. at 8 (quotation marks and citation omitted). But Doe "expressly disavow[ed] any reliance" on substantive due process. *Id.* Justice Scalia's concurring opinion remarked that even if the law implicated liberty interests, the categorical abrogation by a valid statute satisfied due process, just as a law stating that no one under sixteen years of age may drive validly takes away that right regardless of whether someone younger could show they were a safe driver. Thus, absent a claim "that the liberty interest in question is so fundamental as to implicate so-called 'substantive' due process, a properly enacted law can eliminate it." *Id.* at 8 (Scalia, J., concurring). The Commonwealth suggests that the same outcome applies here, and the conviction validly eliminated the right to reputation.

Under the circumstances, we need not address the Commonwealth's position that strict scrutiny is inapposite to deprivations of a criminally-convicted citizen's right to reputation. Attorney General's Brief at 47. As in *J.B.*, it is the fundamental nature of the reputational interest, which has no analog in the United States Constitution, that is harmed by the irrebuttable presumption created by SORNA that justifies our departure from *Doe*.

Assembly, as a matter of policy, has determined that convicted sexual offenders as a cohort pose a particular danger to the public. Given the nature of these legislative findings, they should be accepted as true." Attorney General's Brief at 17.

It is true that the legislature determined that sexual offenders "pose a particular danger," but this argument overlooks that the finding of dangerousness derives from the likelihood of recidivism. The Commonwealth's sources agree with Torsilieri's expert reports that the recidivism concerns cited as justifying these laws are overstated. "There is, obviously, a substantial gulf between the sexual recidivism rates observed in the empirical studies and the rates supposed by the laity and endorsed by the Supreme Court." Drs. Nicolas Scurich and Richard John, "The Dark Figure of Sexual Recidivism," *University of California Irvine, School of Law, Legal Studies Research Paper Series No. 2019-09*, at 4 (https://ssrn.com/abstract=3328831 (Feb. 4, 2019)). Having established that the General Assembly's legislative findings regarding recidivism rates are not supported, we cannot accept the universality of the presumption.

Of course, the General Assembly must be given some leeway in this arena given the public interest involved in protecting the community from sexual offenders. However, I have long criticized SORNA for casting too wide a net. "While it is true that public safety is a paramount governmental interest, the progressively rigid conditions imposed upon sexual offenders necessarily labels a broad number of people as high-risk recidivists without any means of proving otherwise." *Perez*, 97 A.3d at 761–762 (Donohue, J., concurring). Torsilieri's research establishes that the risk of recidivism has been exaggerated across-the-board and proves that revised Subchapter H unjustifiably labels too many offenders as high-risk recidivists.

None of this is to say that the General Assembly cannot craft legislation properly tailored to the governmental interests. Our recent decision in *Butler*, supra, which reversed the Superior Court's decision holding that the SVP designation process was unconstitutional because it permitted the imposition of punitive measures by a clear and convincing evidence standard, highlights that the threat posed by properly-identified classes of offenders is highly relevant. We concluded:

> Although we recognize the RNC requirements impose affirmative disabilities or restraints upon SVPs, and those requirements have been historically regarded as punishment, our conclusions in this regard are not dispositive on the larger question of whether the statutory requirements constitute criminal punishment. This is especially so where the government in this case is concerned with protecting the public, through counseling and public notification rather than deterrent threats, **not from those who have been convicted of certain enumerated crimes, but instead from those who have been found to be dangerously mentally ill**. *Hendricks*, 521 U.S. at 362-63, 117 S.Ct. 2072. Under the circumstances, and also because we do not find the RNC requirements to be excessive in light of the heightened public safety concerns attendant to SVPs, we conclude the RNC requirements do not constitute criminal punishment.

*Butler*, 2020 WL 1466299 at *15 (emphasis added).

*Butler* is not directly on point as the question there was whether SVP obligations constitute punishment, whereas the irrebuttable presumption doctrine involves civil consequences. Nevertheless, there is a clear relationship between the danger posed by a particular class of persons, like SVPs in *Butler*, and how far the General Assembly may go in imposing regulatory measures. The SVP designation process resulted from a particular finding as opposed to the mere fact of conviction, while the Commonwealth argues that the conviction alone justifies imposing registration requirements.

The time has come for this Court to recognize that a consensus will never exist on the question of whether sexual offenders pose a danger of recidivism because different types of offenders pose different types of risks. The Commonwealth now directs our attention to underreporting of sexual crimes as a general matter, and claims that the Subchapter H requirements "are not based upon an individualized assessment of the continuing dangerousness of any particular sex offender or how likely they are to reoffend. **These items are both unknowable**." Attorney General's Brief at 38 (emphasis added). It may well be that the continuing dangerousness of any particular offender or how likely they are to reoffend is unknowable as a matter of empirical fact. But that hardly justifies a legal conclusion that the General Assembly can simply treat all offenders as if they are highly likely to recidivate despite evidence to the contrary.

We can also hardly ignore that the statutory scheme singles out sexual offenders as a class. That group of individuals is deemed by the General Assembly to present special risks that justify treating them differently from all other types of offenders. But the relevant question should not be whether convicted sexual offenders are committing unreported sexual crimes, but rather whether sexual offenders commit more sexual crimes than other groups not subject to similar registration laws. The sole justification for singling out convicted offenders is because their recidivism rates are purportedly so high. That finding having been debunked, the Commonwealth has shifted the goalposts by urging this Court to accept that the real rate of recidivism is unknown since so many crimes are underreported or otherwise fail to result in an arrest or conviction. Even granting the questionable proposition that the unknown could justify onerous registration laws, the Commonwealth does not explain why we should conclude that convicted sexual

offenders are any more likely to commit new sexual offenses than other populations of offenders. I acknowledge that claims that the true rate of recidivism is unknowable because sexual crimes are underreported arguably justifies treating all sexual offenders as likely to reoffend. But that point cuts both ways: the specter of underreported crimes means that offenders convicted of non-sexual offenses also pose a threat of committing sexual offenses. The Commonwealth fails to establish that the population of offenders who are convicted of sexual crimes requiring registration are any more likely to recidivate than any other population of offenders. Nor does the Commonwealth offer any discussion of what percentage of sex offenses are committed by first-time offenders, or address whether a small number of offenders are disproportionately responsible for repeat crimes.

Given that the Commonwealth defines the true rate of recidivism with reference to crimes that are underreported, we can accept that it is forever unknowable to the General Assembly or the judiciary what the true rate of recidivism is. But then the question becomes whether the Commonwealth, consistent with due process, can nonetheless deprive individuals of their constitutional rights to reputation based solely on a conviction. Because there is an alternative means to ascertain whether a particular offender is likely to reoffend, a conviction alone cannot support the infringement. As in *J.B.*, I would hold that the individualized SVP assessment procedure can be expanded to include consideration of the likelihood of re-offense. Every offender who commits a SORNA crime is assessed by the Sexual Offenders Assessment Board ("SOAB"). SORNA defines a "sexual offender" as "[a]n individual who has committed a sexually violent offense. The term includes a sexually violent predator." 42 Pa.C.S. § 9799.12. "Sexually violent offense," in turn, is "[a]n offense specified in section 9799.14 (relating to sexual

offenses and tier system) as a Tier I, Tier II or Tier III sexual offense committed on or after December 20, 2012, for which the individual was convicted." *Id.* And the tier system outlined in section 9799.14 comprises only three tiers. Thus, any offense that carries SORNA obligations is considered a sexually violent offense. However, while all sexual offenders are deemed sexually violent, only a subset are sexually violent predators. "Predatory" is separately defined as "[a]n act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." 42 Pa.C.S. § 9799.12.

To qualify as an SVP, the SOAB must determine that the offender has "a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." *Id.* Mental abnormality is defined as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Id.*

The SOAB's assessment process entails an assessment that considers a large set of information, including whether the offender "exceeded the means necessary to achieve the offense," the relationship of the victim to the offender, the age of the victim, whether the incident involved "unusual cruelty," any prior offense history, and the characteristics of the individual offender. 42 Pa.C.S. § 9799.24(b)(1-3). Significantly, the procedure also requires the SOAB to consider "[f]actors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense." 42 Pa.C.S. § 9799.24(b)(4).

Taken together, the SOAB already considers a wide range of information, including the requirement that the experts employed by the State to serve on the SOAB use factors "reasonably related to the risk of reoffense" as accepted in their field. The Commonwealth offers no reason whatsoever why the expertise of such individuals is not a reasonable alternative to SORNA's overinclusive reach.[6] *See In re J.B.*, 107 A.3d at 10 n .16 ("We recognize that the Commonwealth stipulated that the Juveniles' experts would testify consistently with their research, which does not necessarily entail accepting the underlying research. Nonetheless, the Commonwealth neither provides a substantive critique of this research nor produces any contrary empirical evidence."). The Commonwealth offers no response to Torsilieri's argument that the SOAB is not only well-equipped to make such assessments, but has in fact suggested that process:

> There are well-established risk assessment tools which are already employed in Pennsylvania. Pennsylvania's SOAB, the body created and charged by the Legislature to perform the SVP assessments, 42 Pa.C.S. §§ 9799.24, 9799.35, declared over a decade ago that "actuarially derived" assessments are available and preferable to determine risk for monitoring those convicted of sexual crimes. SOAB, Containment Model, supra, at 192-208. The SOAB can "distinguish between low-risk and high-risk sex offenders" and Pennsylvania's failure to do so "wastes resources" when "most sex offenders are never reconvicted for a sexual offense." *Id.* at 207. In no uncertain terms, the SOAB demanded that "[s]tructured, actuarial instruments should be routinely used." *Id.*

Torsilieri's Brief at 56-57.

---

[6] On some level, the fact that an SVP assessment returns a finding that the individual is not an SVP, as is the case here, implicitly rebuts SORNA's irrebuttable presumption that all offenders are likely to recidivate. Whether an offender is likely to reengage in sexual offenses because of a mental abnormality or personality disorder (and therefore subject to an SVP finding) or due to some reason not falling within that construct would seem to be entirely irrelevant to the danger posed to the public.

This individualized process is superior to the existing scheme, which crudely separates sexual offenses into escalating tiers of severity that results in unjustifiably treating all offenses the same. For example, rape is a Tier III offense, but the crime of rape encompasses the rape of a child as well as sexual encounters between intoxicated individuals that involve disputed questions of consent. Treating the former the same as the latter is simply untenable. We need not, and should not, diminish Torsilieri's conduct. But we should not also overlook that Torsilieri's Tier III obligations are the same as those of a child rapist when determining whether due process has been violated. Once it is accepted that sexual offenders do not recidivate at the incredibly high rates as previously supposed, the justification for treating the two alike dissipates. The existence of a superior procedure that can make individual determinations demonstrates the availability of a reasonable alternative to the existing scheme.

For the foregoing reasons, I would affirm the trial court.